May it please the Court, Theodore Frank for Objector Appellant Brian Perryman. Also at the table is Mr. Skinner from the Arizona AG's office. And I'd like to reserve four minutes for rebuttal. Go ahead. Thank you. Under Allen v. Bedolla and Dennis and Bluetooth, a disproportion between fees and class recovery, actual class recovery, has to be evaluated by the Court before it approves the settlement. And the only reason the Court decided that the $8.85 million that the attorneys got and the $225,000 in cash the class got was not disproportionate, was because it valued the $20 e-credits given to 1.3 million class members at their full face value of $20 each. And whether you do that under 1712 or under the economic reality test of Allen v. Bedolla, that's just legal error. Because? These e-credits, they expire in a year. They're only good for the limited range of flower delivery and gift products that the defendants offer on their websites. They are not good for the two weeks before Christmas or the two weeks before Mother's Day or the two weeks before Valentine's Day. And we submitted evidence that they couldn't even be used to buy whole products. That's under dispute. But even under their version of events, there are only 16 products available on their website that the $20 can purchase. And there was no option, as I understand it, for class members to elect to receive cash instead of e-credit. That's correct. Every class member received an e-credit. The plaintiffs alleged tens of millions of dollars of damage and created a damage claims process that only 0.2 percent of the class took advantage of. So the district court did an alternative Lodestar calculation, and I don't really see you attacking it, so I'm confused because we have, like, two bases for the award, and you're only talking about one of them. Well, we have two answers to that. First of all, the court only did a Lodestar cross-check. That's at ER 36, ER 6, and ER 1, where the court expressly adopted in full the original district court's analysis, and the original district court said on page 36, I am basing this on a $38 million common fund and doing a Lodestar cross-check. But even if you were to look at Lodestar, it is impermissible under Rule 23e for the attorneys to negotiate for themselves full Lodestar recovery and, in fact, a two multiplier, and then a small fraction of that value for the class. You cannot compromise the class's claims to benefit yourself to receive the lion's share of the settlement value. In fact, Dennis says 39% of the total settlement value is clearly excessive. Let me move to this. Supposing that I would suggest that you're right on the attorney's fees, do I affirm this settlement anyway? Absolutely not. Why? Because, I mean, unless we're going to reduce the ---- Does this settlement agreement guarantee a specific amount of attorney's fees? No. No. No. It set a cap for the attorney's fees, right? That is correct. So the fact that the district court determined that the settlement was fair and reasonable even in light of the cap, doesn't that stand on an attorney's fees for abuse of discretion? No, because the settlement was structured to deprive the class of money and instead steer it to the attorneys and to the CPRA, which is itself problematic for multiple reasons, even after Google Refer. It was possible to distribute money to the class. There was a $12 million fund and 1.2 million class members, all of whom were known and identifiable, and, in fact, 1.3 million class members. But there was a maximum amount permitted under the agreement, and we're just trying to determine what the attorney's fees are, and the determination of the settlement was that it was fair and reasonable even in light of the cap. So even if on remand the attorney fee turned out to be lower than the maximum permitted under the settlement, that would only benefit the class or the CPRA. I'm still having a tough time understanding why I would vacate the settlement. Okay. I want to make clear that we're not claiming that $12.5 million is inadequate. If the parties. I mean, if you're saying it's not adequate, that's where I thought you were going. I mean, it seems to me I got a settlement that's approved as fair. I got a cap on the attorney's fees, whatever they are. I'm still trying to figure out why it is that I would undo this good settlement if, in fact, all I'm dealing with is the attorney's fees and we got a cap in line. Well, we don't just have that. We also have the CPRA problem where the parties. Well, but the CPRA, if we go to the CPRA, we could go there. But all I'm saying is the settlement gives it to the class or to the CPRA, and we can argue about whether the CPRA was done right or done wrong. But, in effect, I'm back to the same question. Why isn't the settlement approvable? Because the court failed to follow baby products and adequately valued direct recovery to the class. That's 708F163, and it's very similar to this case. Well, I thought they did. I mean, the settlement agreement says it's fair and gives a cap on the attorney's fees. The court committed legal error by not applying the baby product standard, and that settlement was very similar to this one. It was $35 million, a settlement fund of $35 million, $14 million in attorney's fees, and the Third Circuit reversed because the district court failed to consider that almost all of the money was actually going to CPRA while only $3 million was going to the class. And it's the same problem here, only worse, because Does this district court explain why this settlement was fair? It did not explain why it was not addressing the baby products issue. That isn't what she asked. It said it was fair, reasonable, and adequate under the Churchill Village factors, but those are not the only factors it needs to consider, especially when you have a disproportionate fee to class recovery like you do here. I see that there was very little discussion about why the district court thought this was fair, but I didn't really see you pointing that out in your brief. Well, because we thought we pointed out the legal errors that the court committed. In order for us to agree with you, we've got to swallow that not suggesting that they follow this Third Circuit case is enough. No, because it also did not follow inkjet, which didn't just remand for attorney's fees but remanded for consideration of the whole settlement. And the court valued the settlement at $38.5 million, and that's why it thought it was fair, and that is legal error. I'll reserve the rest of my time for rebuttal. Okay. It's tough when you give somebody else some of your time. Your Honor, may it please the Court, my name is O.H. Skinner, and I'm here from the Arizona Attorney General's Office. All right. Thank you for being here. We appreciate the time, Your Honor. A key threshold error here is the legal determination that these were not coupons under CAFA and that CAFA did not apply. To resolve that legal error, this court needed to find out their coupons, which your co-counsels made a great argument as to why they are. All right. Then at that point, are you through? That is our key. We believe that in order to resolve that error, the court needs to confirm that CAFA applies. And inkjet is very clear that when you have a problem of this nature, and even if it goes to fees, that the entire settlement stands or falls as a whole and that there must be a remand, with this Court's guidance saying that where credits to a specialty retailer have an expiration date, have blackout dates, and cannot be used with all publicly available offers, CAFA applies. This ---- So let's assume it's a coupon and CAFA applies. Could they have used the Lodestar method? Not under inkjet. Inkjet at most says that any of the ---- to attribute any fees to coupons, they must be done on the redemption amount. But do you think that here the district court did attribute anything to coupons? It seems like the district court just sort of accepted the negotiated amount and didn't really calculate it based on the value, some monetary value of the total settlement. So the district court opinion says very clearly that this was analyzed as a common fund and valued the entire common fund at 38 million, which is, for coupons, directly contradictory of CAFA and inkjet, which say that to value the coupons at anything, you must wait until the end of the redemption period, very different than in a case where there is no redemption period. And so the only way this settlement could stand with a Lodestar method is excluding any consideration of the coupons. And then you would have almost $9 million in fees and costs to class counsel as well, which only approximately 250,000 went to them. So under Inkjet, we don't believe that this could stand as it's structured. And that's why the coupon determination is determinative, we believe. If this Court remands and says that CAFA applies and these are coupons, the settlement as structured cannot stand because of the allocation issue that goes directly against the language in CAFA and in Inkjet. All right. This case, the Court has never treated credits to a specialty retailer with the limits here as being anything but coupons. I believe Inkjet is particularly instructive. It was a specialty retailer. There was an expiration date of six months. And you couldn't use the credits with all other publicly available coupons. Intuitively, if you cannot, if you only have one ability to punch in a coupon code and this code takes up that space and supplants another coupon, it's a coupon. And given that that is the entire structure on which the settlement relies, we believe the Court should remand with instructions that the determination was legal error in saying that these are not coupons. Did you address whether I could approve the settlement even though the attorney's fees would be vacated and remanded? You didn't even address that issue, did you, in your briefing? I believe we did, Your Honor, in pointing to Inkjet, which says that the Court is not allowed to rewrite the settlement and that the settlement inciting Hanlon v. Chrysler, the settlement. So you're saying I can't approve it? We don't believe that following Inkjet. The honest truth is here, the settlement agreement, it said what the cap would be on attorney's fees and all the rest was done. I understand that, Your Honor. And if they don't get all attorney's fees, that's either going to go to the class or to the Cypre. To the extent that that is what the Court chooses to do, that is certainly something that we believe advances this toward a potential benefit for consumers. But I do need to point out, Your Honor, in candor that Inkjet and Hanlon do have a language that says that if there is a problem with the fee and the fee is coming out of a common fund, that the whole settlement must stand or fall on its own. I understand. I even got that language right in front of me. But the bottom line is, even though that's true, this did not guarantee a specific amount of attorney's fees. It set a cap. So we know what the situation is. We know that's the best it's going to be. And I take that point, Your Honor. And to the extent that the Court chooses to remand, the priority of payments in the settlement puts money first to class counsel. To the extent that the Court wishes to remand and says CAFA applies, this does not comport with CAFA and wants to provide instructions. That's within the discretion of the panel, I would say. Did you address the Cypre component of the settlement at all? No, we did not, Your Honor. This coalition did not speak to that question. All right. Thank you again for the time today, Your Honor. May it please the Court. Bruce Steckler for Plaintiff Appellees. I'll be addressing the following issues for the panel, whether the district court abused its discretion in concluding that the settlement was fair and reasonable, whether the district court abused its discretion and committed clear error in reviewing the record in concluding that the settlement was not a coupon settlement under CAFA, and in accordance with this Court's opinion in In Re Online DVD. I'll be addressing whether the Court abused its discretion in concluding that the attorney's fees were reasonable using both the percentage of the fund methodology and the Lodestar methodology. And if time's allowed, I'd like to address the AG's filings. Mr. Norton will be addressing Cypre. He'll be right after me. I think it's important to note in this particular case, the standard of review, as everyone is well aware, is there has to be a strong showing that the court decision was a clear abuse of discretion. It's unique in this case. But if the Court got the coupon issue wrong, that's an error of law? That would be an abuse of discretion? I would agree. That would be an abuse of discretion. But we have an interesting situation here. We've had two judges, Judge Battaglia and Judge Beshant, who looked at this particular issue. Judge Battaglia first evaluated the $20 credits, which is exactly what the class members sought originally that got enrolled in the program, and said that was not a coupon. In addition, we were lucky enough to have In Re DVD, where this Court provided instruction and outlined exactly the type of factors and items that should be evaluated to determine what was a coupon and not. Judge Beshant, in that instance, evaluated the $20 credits, and she determined, based upon In Re DVD specifically, which, as you all know, is well outlined, in her opinion, that this was not a coupon, nor was CAFA applicable. I don't understand how, though, because this is limited products, limited amount of time, all kinds of restrictions to not even allow you to buy the products when you would want to. How do you get around any of the – how does any of that fit with In Re DVD? I'm happy to address it. Let me add a little P.S. to that so you'll cover it. If this isn't a coupon, what is a coupon? Well, we know from this Court's ruling that coupons are valueless, or when you, let's say, I think the example that Chief Judge Thomas said in his opinion, if you spend $5, you know, then you get a dollar off, or if you spend – that would be a valueless coupon. Or the vouchers that you see – I mean, you have to look at the redemption rate, and that doesn't mean it's going to be valueless. It just means it's going to be less than the face value. I understand. But the analysis that was used by this Court, if I'm correct, was, first of all, was it transferable? In this case, the $20 credits could be used as cash, could buy 15 to 25 items on various websites of defendants. It's a really small number of items compared to all the things at Walmart that cost $12 or less, right? It has to do with the size of the retail. In addition, we have to understand, this was a replacement … Could they get cash instead of the credit? Well, this isn't a … Could they get cash instead of the credit? No. No, they cannot. And let me address that specifically, because I think that's important. I do, too. I do. That's why I brought it up. I appreciate that, Your Honor. And the reason I think it's important to point out is, this was a program where people were lured in by a gift code, a $15 gift code, that if they filled out their $15 gift code to use on the websites, and those gift codes expired, and those gift codes were used on those websites for items. I mean, maybe that means it's very analogous to the claim, but that doesn't mean it's not a coupon. Maybe the thing that they were supposed to get, this gift code, was a coupon. Well, I don't think it's … I don't think it's a coupon, because, one, it has value. It's transferable. It can buy substantial items on the website. And it also is a replacement for what people allege they never got, which was the $15 gift code, which is … which is unique in this case as to coupons. It's because people got their money back who were … Was the gift code supposed to work on Mother's Day and Valentine's Day? I … well, hold on. This involved a number of gift codes over a long period of time. I do not believe, and I have to look at the record, there were certain blackout dates on certain gift codes at certain times because the company did not want to be overwhelmed with gift codes during the times when they know people are going to go to the website. Because the only time they have value is on Valentine's Day and Mother's Day. I would disagree. And, in fact, I think Judge Beshant helped us address this very issue with Mr. Frank, and that is the fact that people do not just buy flowers and cards and gifts and chocolates for their loved ones on just two holidays. All year long, I would hope, at least my wife would hope, that I would do that. But doesn't the fact that you're busiest on those days show that that's when people value it most? That's why it's busiest on those days. And that shows the actual value you're getting, because part of the negotiation is there were certain days they didn't want to have the gift codes because they had so much value, which goes against the coupon idea, is that, and it's in the record, is that they were concerned of getting flooded by 1.3 million people who would be getting the $20 credits to actually use to purchase products. So in that instance, it's actually the fact that there are some blackout dates that was insisted upon by defendants shows the significant value that the $20 credits actually have. I understand you're giving me that look, but the look is they still have value. They had so much value that they can still be used at other times a year. Well, how much value do they have? That's the whole reason that there's supposed to be an analysis, because some people are never going to use them. And yet the attorney's fees are being calculated as if they're all going to be used. Well, in any settlement, we're giving a $20 credit to people. I don't believe, and they can transfer it, they could sell it, they could give it to a friend. They can transfer it, yeah. Yes. I got it down here. Yes. It can be transferred. I understand. I haven't got it. I mean, does not expire, wrong. Couldn't be spent as long as they This particular e-credit does not make it on three of the four. Well, I would argue to the contrary. I actually think this is better than... I understand that's what you're supposed to do is argue, but let's put it down here. Does it spend on any item? It can spend on up to 15 to 25 items completely, yes. Up to 15 to 25? Yes, that's what the record reflected. What does that mean? What does that mean? You can buy in full up to 15 to 20. I think there are four different websites. So there are some items I'm going to have to put out my own cash? Just like in Walmart, yes. All right. Does not expire. It does. It does. There are blackout dates. It does transfer. Correct. Was there an option of getting cash rather than the card? No. So then I'm trying to say, how does that exactly go along with DVD? Well, because... That's what the district judge found, and I couldn't find it. Because this... I was trying to figure out if he just had a better lawyer or what the deal was. Well, I think that's because of the context of this case. And I think that's really important, is that this was a replacement for the gift code that these individuals, these 1.3 million individuals wanted and intended to use but never got. That goes to whether it's fair, though, but it doesn't go to whether the attorney's fee should be calculated assuming it's a coupon. I just don't understand how you get from one to the other. Well, one, let's argue in arguendo, let's say, because everyone does get their money back who were inadvertently enrolled in this data pass scam. Well, they probably get $3. They may not get their money back. That's not true. I apologize for interrupting. What I meant is it's a $1.95 activation, and everyone was charged $14.95 a month that was inadvertently enrolled. And the information we got through Discovery is people were in there three months or more before they even realized their credit cards were being deducted. So the average person, for example, the objector, is getting $121 back and $0.55 that he was inadvertently charged for enrolling in the program. In addition — And you don't think there are going to be too many claims for that to happen for everyone? You think there's going to be enough money in the $3 million to give full recovery to all those fees? It doesn't make sense. It doesn't add up. Well, actually, we had — we pushed out — we had the e-mails for everybody that was inadvertently enrolled, sent it out. We got a 3,000 — Out of 1.3 million. Yes. So only 3,000 out of 1.3 million people who were actually getting their money back made a claim. And yet, for purposes of the e-credit, we're going to assume, in effect, for awarding attorneys' fees, that all these people are going to use their e-credit. It's just completely inconsistent with what actually happened. And that's — unfortunately, as your plaintiff's lawyer, when you get involved in a lawsuit like this and you file it, I can't think of a better result for people that if they had the opportunity, they could get their money back. We had their e-mails. We e-mailed them out. Then we mailed them. You must have had their credit cards. Why not just refund everyone? I mean, you could have given some amount of refund to everyone, couldn't you, instead of having them make a claim? It seems like there are a lot of ways to help the class more. Well, the issue was, in the case — and the reason that could not have been done, and I'm glad you asked, is there was an issue as to people — the argument was that people voluntarily signed up for the program as opposed to people who inadvertently lured into the program. Therefore, they sent the e-mails and asked them to check to verify whether you were inadvertently enrolled or you intended to be a part of the program. And so that was a big issue. And that's — that's why it was done this way. And we wouldn't just push it to people's credit cards. It's because there had to have been verification. And the issue, too, is this was litigated for almost three years. So e-mails may have gone bad. People — there were bounce-backs, so we direct-mailed them. So we tried to get them 100 percent of their money back who wanted it. And in addition to that, they got the gift code that they sought originally, then enrolled them in the program that narrowly is tailored to exactly what they were seeking in the first place, which is the restitution that they were entitled to. Given the combination of the settlement as a cash component, and if you want to argue, although I firmly disagree that it's a coupon, either way, the Court utilized the lodestar methodology. This was litigated for, as this Court notes, three years, 7,000 hours, 12 depositions, expert, discovery was exchanged. This was an actual real lawsuit to bring real value to real people to utilize. And I find it ironic because when we look at the value in a case like this, you know, and I hear the AGs arguing, for example, about the fee. Well, where were the AGs when we contacted them, provided them with notice of the — of this? Fifteen of them responded. One of them, interestingly, was Texas. They had no objections. Now they're showing up as objectors. And they never stood up and stopped data pass. They didn't bring restitution to their constituents. And to the contrary, now they don't like the attorney's fees. What would the cost have been for every one of these States to bring their own action? I guess your — your cohort is saying you can please sit down so I can say what I want to say. May it please the Court, Your Honors. Leo Norton of Cooley LLP on behalf of Appellee Defendant Provide Commerce, Inc. I just want to briefly address the three CyPRAE objections that Mr. Frank made. First is the geographic scope of the CyPRAE. There's no argument here that there's a driving nexus with the underlying claims and issues in the case. In terms of the geographic scope, these are all three highly ranked national universities that draw students and have alumni in all 50 States. That was in the record, and that's specifically what the district court found. So I do not believe that that objection carries any basis. In terms of the alumni status of two of the over 20 attorneys that appeared, I think that that issue was recently addressed by this Court in the Google Refer Header litigation. The record here establishes that it's pure alumni status for the couple of attorneys. And I had submitted a declaration that was before the district court that in the course of negotiating the CyPRAE recipients that whether alumni status or any other connection was not the basis of selecting these. They were looking for national universities that would have a national reach that could address internet data security and privacy issues. In terms of the last objection, which is the further distribution to class members, this was also addressed by this court in the Google Refer litigation. Here with the remainder amount. Do we know how much the remainder amount is or will be? It's, we'll call it roughly 3 million. It's slightly under. And so with 1.3 million class members, they basically, after administrative costs for note the postage and cutting the checks, would get a dollar or two. So it's clear that that amount is going to be infeasible to distribute to those class members. The other idea that Mr. Frank proposed in his briefing was a. I'm sorry, I'm confused. I thought 3.5 million was available to reimburse class members for the fee that they were charged to become members of this thing. And then it's just if that 3.5 doesn't get used up by the reimbursement request, the rest goes to the CyPRAE. But you just made it sound like the whole thing is going to go to the CyPRAE. Well, so the claims, the claims are already in, right? And there were 3,000 claims of approximately $225,000 plus where the. Oh, so there are almost no claims is what you're saying. So it is mostly going to go to the CyPRAE. Mostly correct. What is that $12.5 million figure? I may be confused. The $12.5 million is the value of the total fund. And then it's reduced by the attorney's fees, the claims for full reimbursement by the class members, as well as the claims administration. The class members are getting $225,000. The attorneys are getting $8 million. And the CyPRAE is getting $3.5 million. After this all shook out. We don't really have to deduct very much because it's only $225,000 that the class members are getting. Correct. After it shook out, the settlement was set up that any remainder would go to the CyPRAE. And that's the balance of our time. Thank you, Your Honor. Thank you. Time has expired. All right, you've got two minutes. Thank you, Your Honor. If you look at the complaint, ER-455-56, the complaint does not ask, we want another coupon or a gift code or whatever they want to call it. It says, we want cash. And in their own briefing, they say that there are tens or hundreds of millions of dollars of damages. And that's been settled for $225,000 plus whatever the coupon is worth. And it's not the case that a coupon is valueless or it's not a coupon. You could have, for example, $1,000 off on a car. That's a coupon. It has value even if it's transferable, but it's still a coupon. In fact, the very first coupons in the 1880s, according to Time magazine, Coca-Cola issued coupons for a free glass of Coca-Cola. That was the very first coupon out there. So, and the complaint calls these coupons also for that matter. So the idea that if, as long as it has a modicum of value, you value it at the full face value and you don't treat it as a coupon, that's just simply not true. And they had evidence, they still have evidence, of what the redemption rate of these would be because they settled an almost identical case with almost identical relief in similar Cypre to a San Diego university where they would name a professorship after Provide Commerce, the defendant, where the class got coupons. The coupons have expired in 2014. They know what the redemption rate was. We asked the court, make them tell you what the redemption rate is so you know how much these coupons are worth. The court didn't do it. They still haven't disclosed it, and that's because we suspect the redemption rate was embarrassingly low. I'm happy to answer any other questions you might have. I don't think we have any. One more thing about the distributability of the Cypre. If you reduce the attorney's fees to $3 million to reflect 25 percent of the $12.5 million fund, then you'll have over $9 million left over to pay 1.3 million class members, and that absolutely is distributable. Thank you, Your Honor. Thank you. All right. This case is submitted.
judges: N.R. Smith, Friedland, Lynn